DONALD W. SEARLES (Cal. Bar No. 135705)
Email: searlesd@sec.gov
M. LANCE JASPER (Cal. Bar No. 244516)
Email: jasperml@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
John W. Berry, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| STEVEN J. MUEHLER, CLAUDIA M. MUEHLER, KOOROSH "DANNY" RAHIMI,  ALTAVISTA CAPITAL MARKETS, LLC, ALTAVISTA PRIVATE CLIENT, LLC, AND ALTAVISTA SECURITIES, LLC, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 20(b),

20(d)(1), 20(g), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d)(1), 77t(g), and 77v(a)], and Sections 21(d)(1), 21(d)(3), 21(d)(6), 21(e), 27(a), and 27(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(1), 78u(d)(3), 78u(d)(6), 78u(e), 78aa(a), and 78aa(b)].

2. Defendants have, directly or indirectly, made use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the acts, practices and courses of business alleged herein.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], because one or more of the acts or transactions constituting the violations alleged occurred within this district. In addition, venue is proper in this district because the defendants are located and conduct business within this district.

## SUMMARY

4. The SEC brings this action to preliminarily and permanently enjoin Steven J. Muehler ("Muehler") from continuing to violate the federal securities laws. Muehler is a three-time recidivist, having been the subject of a recent SEC cease-and-desist order in June 2016 (the "2016 SEC Order"), and separate cease-and-desist orders from state regulators in California and Minnesota. Yet he continues to violate the law, using his same playbook to defraud small business owners hoping to raise money from investors. In fact, Muehler is currently violating the cease-and-desist requirements of the 2016 SEC Order, despite having consented to its entry and being fully aware of its terms.

5. To carry out his current scam, Muehler has resurrected the key aspects of the prior scheme that led to the entry of the SEC order against him by simply creating a new group of companies (collectively, the "AltaVista Companies") to perpetrate the same scheme. In his new scheme, Muehler and his AltaVista Companies agree to help small businesses raise money from investors under "Regulation A" – a regulation that allows small businesses to raise money from investors without

registering those offerings with the SEC.   And just like his prior scheme, Muehler and his companies agree to act as broker-dealers for the small businesses by helping to identify potential investors and offering to effect securities transactions for them over an allegedly proprietary "Nanocap Market," which Muehler claims is an online securities exchange.  In return, Muehler and his companies receive fees, the right to a percentage of any funds raised from investors, and the right to an equity stake in each issuer.  But they cannot do any of this legally since none of the Alta Vista Companies are registered with the SEC as broker-dealers, and Muehler himself is barred from associating with any broker-dealer under the 2016 SEC Order.

6.     Muehler and his AltaVista Companies also make numerous false and misleading statements to their small business customers.  For example, they falsely claim that they previously helped small businesses raise millions of dollars, that they have $50 million on-hand to invest in their customers' securities, and that some AltaVista Companies are registered with the SEC.  Muehler and his companies also engage in deceptive conduct in carrying out this fraud, using false personas in emails, impersonating others on telephone calls, and forging documents.  And they conceal the 2016 SEC Order, as well as the California and Minnesota orders against him.

7.     In addition, Muehler and the AltaVista Companies have attempted to raise money by offering to sell bonds issued by so-called "Fixed Income Mortgage Funds" that they said were associated with the Alta Vista Companies.  The offer and sale of those bonds should have been, but were not registered with the SEC.

8.     Muehler operates this scheme with substantial assistance from his wife, Defendant Claudia M. Muehler ("Claudia Muehler"), who provides funding for the AltaVista Companies, helps identify potential customers, purchases investor leads, and signs agreements for the AltaVista Companies.  She and Muehler operate the AltaVista Companies out of their condominium in Marina Del Rey, California.

9.     During 2016 and 2017, Defendant Koorosh Rahimi, also known as Danny Rahimi ("Rahimi"), worked for Muehler and the AltaVista Companies.

Rahimi was not registered as a broker-dealer or associated with a registered broker-dealer during that time.  Nevertheless, he helped Muehler solicit customers and investors, including investors for the unregistered bond offering in 2016.

10.     By engaging in this conduct, Muehler violated, and is violating, Section 5(c) of the Securities Act, 15 U.S.C. § 77e, and Sections 10(b), 15(a) and 15(b)(6)(B) of the Exchange Act [15 U.S.C. §§ 78j, 78o], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; the AltaVista Companies violated, and are violating, Section 5(c) of the Securities Act [15 U.S.C. § 77e], and Sections 10(b) and 15(a) of the Exchange Act, [15 U.S.C. §§ 78j, 78o], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; Claudia Muehler has aided and abetted, and is aiding and abetting, Muehler's and the AltaVista Companies' Exchange Act violations, in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t]; and Rahimi violated Section 5(c) of the Securities Act [15 U.S.C. § 77e], and Section 15(a) of the Exchange Act [15 U.S.C. § 78o].

11.     The SEC seeks a preliminary injunction against Muehler, Claudia Muehler and the AltaVista Companies prohibiting future violations, pending trial of this action.  In addition, the SEC seeks permanent injunctions against all of the defendants prohibiting them from future violations of the securities laws they have violated, disgorgement of their ill-gotten gains together with prejudgment interest, and civil penalties.  The SEC also seeks an injunction against Muehler that bars him from participating in the issuance, purchase, offer or sale of securities, and an order barring the AltaVista Companies, Claudia Muehler, and Rahimi from participating in an offering of penny stock under Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

## **DEFENDANTS**

12.     **Steven Joseph Muehler** is a resident of Marina Del Rey, California.

13.     Muehler controls the AltaVista Companies, which he owns and co-founded with his wife, Defendant Claudia M. Muehler.

14.     Muehler never registered with the SEC in any capacity and has never

associated with a registered broker-dealer during his operation of the AltaVista Scheme.

15.   **Claudia Martins Muehler** resides with her husband, Muehler, in their Marina Del Rey condominium, out of which she and Muehler operate the AltaVista Companies.

16.   Muehler and Claudia Muehler were married in 2008.

17.   Claudia Muehler co-founded the AltaVista Companies with Muehler. She has never been registered with the SEC in any capacity and has never been an associated person of an SEC-registered entity.

18.   **Koorosh Rahimi** is a resident of Los Angeles, California.

19.   Rahimi worked with the Muehlers and the AltaVista Companies from approximately March 2016 until approximately February 2017.

20.   Rahimi never registered with the SEC as a broker-dealer or investment adviser, and was not associated with a registered broker-dealer or investment adviser when he worked for the AltaVista Companies.

21.   Rahimi's experience prior to working with the AltaVista Companies included working as a registered investment adviser representative and/or a registered representative with several different firms from July 2011 through September 2014. Rahimi previously held Series 6, 7, 31, 63, and 66 licenses, all of which expired two years after the termination of his last association with an entity registered with the SEC.

22.   **AltaVista Capital Markets, LLC** ("AV Capital Markets") is a California limited liability company operated out of the Muehlers' condominium. AV Capital Markets never registered with the SEC in any capacity.

23.   **AltaVista Private Client, LLC** ("AV Private Client") is a California limited liability company operated out of the Muehlers' condominium.  AV Private Client never registered with the SEC in any capacity.  Muehler sometimes markets AV Private Client as an operator of the Nanocap Market.

24.    **AltaVista Securities, LLC** ("AV Securities") is a California limited liability company operated out of the Muehlers' condominium.  Muehler sometimes markets AV Securities as an operator of the Nanocap Market and sometimes markets AV Securities as a registered broker-dealer.  AV Securities never registered with the SEC in any capacity.

## FACTUAL ALLEGATIONS

25.    The Defendants' current scheme is very similar to past schemes Muehler has perpetrated.  In short, their current scheme involves offering broker-dealer services to small businesses, including promises to help them raise money, even though they have never registered as broker-dealers and Muehler is specifically barred from engaging in this activity under the 2016 SEC Order.  As he did in his prior scam, Muehler and his companies mislead small businesses to convince them to sign up for these unlawful services.

26.    The AltaVista scheme is ongoing.  Muehler and Claudia Muehler continue to own and operate the AltaVista Companies, which continue to solicit small business issuers for their broker-dealer services and continue to solicit potential investors for these customers.

### A.    The Prior ASMG Scheme and Other Sanctioned Conduct

27.    Before engaging in his current AltaVista scheme, Muehler operated a similar unregistered broker-dealer and securities fraud scheme under the name "Alternative Securities Market Group" (the "ASMG Scheme").  He carried out that scheme from approximately August 2013 until the SEC instituted administrative proceedings against him in September 2015.

28.    The ASMG Scheme was essentially the same as the current scheme that is the subject of this Complaint.  In the ASMG scheme, Muehler and entities he controlled offered broker-dealer services to small businesses, and Muehler lied to those small businesses to induce them to pay him and his companies for the proposed services.  Although Muehler attempted to sell securities for his customers in the

ASMG Scheme, he failed to consummate any transactions before the SEC instituted enforcement proceedings.

29.     During those proceedings, Muehler consented to the entry of the 2016 SEC Order (Exhibit A hereto, Muehler Offer of Settlement).  The SEC order, attached hereto as Exhibit B, was made publicly available on the SEC's website after it was entered.  *See* www.sec.gov/litigation/ admin/2016/34-78118.pdf.

30.      In consenting to the entry of that order, Muehler admitted that he and his companies held themselves out as broker-dealers that provided broker-dealer services and offered and agreed to effect securities transactions for customers over the Internet, primarily under Regulation A, in connection with proposed securities offerings.

31.     Muehler also admitted that he and his companies, to persuade small business owners to sign up for their services, made numerous false and misleading statements and omissions, and engaged in other deceptive practices, including making false claims that they had helped other small business raise millions of dollars from investors, and by concealing the Minnesota and California cease-and-desist orders.

32.     Muehler further admitted that by engaging in this and other admitted conduct, he and his companies violated the federal securities laws.

33.     Under the terms of the 2016 SEC Order, Muehler was ordered to cease and desist from committing or causing any violations and any future violations of Section 10(b) and 15(a) of the Exchange Act, and Rule 10b-5 thereunder.  In addition, Muehler was barred from associating with a broker or dealer and from participating in any offering of penny stock, and prohibited from acting as an officer or director of a public company.  Muehler was also ordered to pay over $410,000 in disgorgement and civil penalties.

34.     The Minnesota and California cease-and-desist orders were entered against Muehler before the SEC issued its 2016 order against him.  The Minnesota order, attached as Exhibit C hereto, was issued in 2009 by the Minnesota Department

of Commerce and ordered Muehler to cease and desist from fraudulent conduct in the offer of unregistered securities and from acting as an unregistered broker-dealer.

35. The California order, attached as Exhibit D hereto, was issued by the California Department of Corporations and ordered Muehler to desist and refrain from offering unregistered securities.

**B.    The AltaVista Companies**

36. Defendants Muehler and Claudia Muehler founded the AltaVista Companies together in late 2015.

37. The Muehlers and the AltaVista Companies have not followed corporate formalities while carrying out the AltaVista Scheme.  Instead, Muehler treats, and has always treated, the AltaVista Companies as interchangeable parts of a single enterprise under his control.

38. At times, Muehler has purported to give senior leadership or ownership roles in one or more of the AltaVista Companies to Claudia Muehler and Rahimi.

39. To distance himself from his extensive disciplinary history with state and federal securities regulators, and to further deceive his customers, Muehler has sometimes disclaimed his ownership and role in managing the AltaVista Companies. For example, he has created a paper trail to suggest that one or more persons other than himself owns or manages those companies.  At all relevant times, however, Muehler controlled the AltaVista Companies and their operations, and both he and his wife owned those companies.

40. Both Muehler and Claudia Muehler received remuneration in connection with their operations of the AltaVista Companies, including through personal receipt of customer fees paid to the AltaVista Companies.

41. At times, Claudia Muehler deposited and otherwise received compensation drawn from customer fees into her personal bank account.

C.   **The AltaVista Scheme:  Providing Broker-Dealer Services Without Registration and In Violation of the 2016 SEC Order**

42.   From approximately November 2015 until the present, Muehler has used the AltaVista Companies to continue the unregistered broker-dealer and securities fraud scheme he previously perpetrated in the ASMG Scheme.

1.   **Marketing and Solicitation of Customers**

43.   Beginning in November 2015, and continuing to the present, Muehler has marketed the AltaVista Companies to small businesses as a combination underwriter, broker-dealer and alternative trading system, or "ATS," with connections to thousands of potential investors.

44.   Muehler and the AltaVista Companies claim to have a number of associated investment funds, which can invest millions of dollars in their customers' businesses (the "Alta Vista Investment Funds").

45.   Muehler and the Alta Vista Companies advertise one of the companies, AV Capital Markets, as an underwriter of securities that can facilitate public offerings on its allegedly proprietary "Nanocap Market."  This purported market is Internet-based, and Muehler developed, created, and controlled the website for the market at all relevant times.

46.   Muehler markets this Nanocap Market as an SEC-registered alternative trading system.  An alternative trading system is a place where investors can buy and sell stock, but is not regulated by the SEC.  However, all ATSs must be registered with the SEC before they can operate legally.

47.   The purported Nanocap Market has never registered with the SEC in any capacity.

48.   Muehler and the AltaVista Companies primarily identify potential small business customers on crowd-funding websites on the Internet.

49.   After identifying potential customers, Muehler and the AltaVista Companies send them unsolicited emails and marketing materials prepared and

approved by Muehler, most of which are based on materials Muehler used in connection with the ASMG Scheme.

50.     Potential customers who express interest receive additional marketing materials developed and approved by Muehler, based largely on materials he used during the ASMG Scheme.

51.     Muehler typically finalizes deals with customers over the telephone or through in-person meetings.

52.     At times, Muehler uses false names, such as Steven Leite, when speaking with prospective customers.

53.     At times, Muehler has also pretended to be Rahimi when speaking with potential customers.

54.     Muehler conceals his identity when speaking with potential customers in an effort to hide his role in the AltaVista Scheme, and to distinguish it from the scheme described in the publicly available 2016 SEC Order and from other negative information about Muehler that is publicly available on the Internet.

55.     In addition, he impersonated Rahimi in an effort to give the impression that the prospective customer was speaking with someone who holds – or previously held – securities licenses, as Rahimi did.

### 2.     Services Offered to Small Businesses

56.     In seeking customers, Muehler and the AltaVista Companies offer and agree to provide broker-dealer, ATS and underwriting services for the express purpose of helping those customers raise startup capital from investors.

57.     The services include:

(a)     conducting due diligence, reviewing business plans, and approving the customers' financial statements;

(b)     structuring the terms of the proposed securities offerings;

(c)     identifying potential investors;

(d)     screening potential investors, purportedly to ensure they are

limited to registered broker-dealers, registered investment advisers, licensed banking firms, and other select firms;

> (e)     marketing the securities to investors; and

> (f)     managing investor expectations about the issuers.

58.     The services also include assisting the customers in having offerings of their securities qualified under the SEC's Regulation A under the Securities Act.  The services offered include preparing and filing Regulation A offering circulars with the SEC in order to pursue that qualification.

59.     The services offered also include listing the securities qualified under Regulation A for sale to investors in initial public offerings on the Nanocap Market website; allowing investors to purchase customer securities on the Nanocap Market; and providing an online secondary market for post-IPO trading.

60.     In addition, under a typical agreement with a small business customer, the AltaVista Companies promise to help the customer sell the business' convertible, preferred stock to investors (the "Customer Preferred Stock").

61.     Muehler and the AltaVista Companies also offer and agree to underwrite the customers' offering of Customer Preferred Stock.

62.     As part of this service, Muehler and the AltaVista Companies sign agreements with their customers in which the AltaVista Companies guarantee that certain minimum levels of capitalization will be raised (the "Minimum Investment Commitments").  For some customers, this Minimum Investment Commitment is equal to several million dollars.

63.     Muehler and the AltaVista Companies promise that, if a proposed offering raises less than the specified Minimum Investment Commitment for that offering, the AltaVista Companies will have one of the AltaVista Investment Funds purchase enough Customer Preferred Stock to meet the Minimum Investment Commitment.

64.     The AltaVista Investment Funds, however, did not have any funds or

investors.  Therefore, none of the funds, to the extent they even existed, ever had any reasonable prospect of fulfilling any of the Minimum Investment Commitments.

### 2.    The AltaVista Companies' Compensation

65.    To receive these services, the small business customers and the AltaVista Companies enter into "Equity Capital Funding" agreements, "Nanocap Market Listing" agreements or similarly titled agreements.

66.    In return for the AltaVista Companies' promise to provide underwriter, broker-dealer and ATS services under these agreements, their customers pay up-front and monthly fees, as well as "Broker-Dealer Fees."

67.    The up-front and monthly fees vary.  Multiple customers have paid up-front fees ranging from $10,000 to $20,000, and monthly fees from $400 to $1,500 per month.  The "Broker-Dealer Fees" are equal to a percentage of the funds that are raised from investors.

68.    Muehler, Claudia Muehler, and the AltaVista Companies collect and have collected fees from customers and have commingled those fees into accounts used to pay the Muehlers' personal expenses.

69.    The customer agreements also grant the AltaVista Companies an equity interest in each issuer customer upon the occurrence of certain milestones in the proposed offering, such as successful capitalization of the customer up to a specified amount.  The equity interest typically is in the form of the customer's common stock, and is to be conveyed by the customer to one of the AltaVista Companies or one of the AV Investment Funds (the "Customer Common Stock").

### 3.    Services Provided to Small Business Customers

70.    Since November 2015, the AltaVista Companies have signed agreements with more than 20 customers and collected approximately $100,000 in fees.

71.    For some or all of these customers, Muehler has been personally involved in providing services to the customers.

72.    Muehler has helped structure the proposed offerings of the customers'

securities to raise capital for the customers.

73.     Muehler has drafted and submitted Regulation A offering statements to the SEC (without disclosing his role in the process to the SEC).  He has also helped customers navigate the SEC's comment and review process for the proposed offerings under Regulation A.

74.     Muehler has prepared Nanocap Market "listing pages" for use in advertising customer securities, and has issued press releases on the Internet concerning the Nanocap Market.

75.     Muehler has also solicited investors by purchasing thousands of leads on the Internet, each with contact information for a prospective individual investor, and sending to the prospective investors information about the Nanocap Market, the Nanocap Market website, and the AltaVista Companies' customers.

76.     Muehler and the AltaVista Companies have received interest from numerous potential investors.

77.     Muehler has personally screened each investor who expresses interest to determine whether such investor meets the criteria for Nanocap Market investors that Muehler advertises to his and the AltaVista Companies' small business clients.

78.     Muehler and the AltaVista Companies have helped at least four small businesses qualify to sell securities under Regulation A and have attempted to find investors to purchase his and the AltaVista Companies' customers' securities.

### 4.     Lack of Registration and Violations of the 2016 SEC Order

79.     As alleged above, from November 2015 to the present, Muehler and the AltaVista Companies have engaged in the business of a broker-dealer by acting, and continue to act and hold themselves out as broker-dealers, in exchange for transaction-based compensation, including a percentage of funds raised.  They have also offered to act as a securities exchange and an alternative trading system.

80.     They have done so with regularity by soliciting hundreds of potential customers and investors, signing more than twenty customers to offer securities,

proposing to sell securities on their proprietary Nanocap Market, and soliciting and screening potential investors.

81.    Muehler personally offered to provide, provided, and endeavored to provide those services, including by soliciting issuer customers, structuring the proposed offerings, screening investors, holding himself out as the person who would make issuer offerings successful, and seeking to qualify and sell customer securities to investors.

82.    Rahimi also engaged in the business of a broker-dealer by soliciting potential customers for the AltaVista Companies' broker-dealer services; soliciting dozens of potential investors in the AV Investment Funds, through which AltaVista committed to investing in its issuer customers; and expected to receive transaction-based compensation.

83.    Muehler and the AltaVista Companies have engaged in these broker-dealer activities using the instrumentalities of interstate commerce, including emails and telephone calls, and for the accounts of their customers.

84.    Each of the AltaVista Companies has never registered as a broker-dealer, securities exchange, alternative trading system, or otherwise with the SEC.

85.    Muehler never registered with the SEC as a broker-dealer and was never associated with a registered broker-dealer during his time running the AltaVista Companies.

86.    By virtue of the 2016 SEC Order, Muehler is, in fact, barred from associating with any broker-dealer.

87.    As alleged above, Muehler and his AltaVista Companies have offered and attempted to sell, and have otherwise participated in the offer and attempted sale of, the Customer Preferred Stock.  For all or almost all of their 20 customers, the Customer Preferred Stock that Muehler and the AltaVista Companies agreed to help offer and sell were penny stocks, since these were equity securities that did not trade for five dollars or more and do not meet any of the exceptions from the definition of a

penny stock found in the Exchange Act.  15 U.S.C. § 78c(5)1(A).

88.     By associating himself with the Alta Vista Companies that were acting as broker-dealers, and by participating in the offer and sale of penny stock, Muehler has violated and is continuing to violate the terms of the 2016 SEC Order.

**D.     The Alta Vista Scheme:  The Fraud**

89.     Muehler and the AltaVista Companies have repeatedly misled customers about their capabilities to provide the services they promise.

90.     Muehler and the AltaVista Companies are not sophisticated, well-financed players in the securities industry.  On the contrary, the AltaVista Companies are run out of Muehler's condominium, and neither Muehler nor the AltaVitsa Companies has any meaningful experience with lawful securities offerings.

91.     Given their lack of abilities, experience, and status in the securities industry, Muehler and the AltaVista Companies rely on fraud and deception to persuade small businesses to sign up for their services, and to obtain fees and other compensation from those customers, including the right to an equity stake in each customer.

92.     Muehler and the AltaVista Companies make false claims that they have helped customers raise millions of dollars from investors, even though neither Muehler nor the AltaVista Companies ever helped a small business raise millions of dollars – or any substantial amount of money – from investors.

93.     Muehler and the AltaVista Companies sign the Minimum Investment Commitments without disclosing that Muehler, the AltaVista Companies, and the Alta Vista Investment Funds have minimal assets and no reasonable expectation of meeting those commitments.

94.     Muehler and the AltaVista Companies make false claims that they have millions of dollars on hand to meet the Minimum Investment Commitments, even though the AltaVista Companies have minimal assets, nearly all of which derive from customer fees that are spent or distributed to Muehler and Claudia Muehler shortly

after receipt from the customer.

95.     Muehler and the AltaVista Companies make false claims, and otherwise falsely represent, that they are established players in the securities industry with connections to thousands of investors, without disclosing that neither Muehler nor the AltaVista Companies have the claimed experience or connections.

96.     Muehler and the AltaVista Companies make false claims that AV Securities is a registered broker-dealer, and that the Nanocap Market is a registered ATS, even though neither entity ever registered with the Commission in any capacity.

97.     Muehler and the AltaVista Companies also deceive potential issuer customers by emphasizing their ability to raise money, and touting their expertise and experience in exempt securities offerings, without disclosing the 2016 SEC Order, the 2009 Minnesota order, or the 2010 California order, each of which concerns Muehler's unlawful, securities-related misconduct in similar schemes.

98.     When confronted with the 2016 SEC Order, which some of the AltaVista Companies' customers have found on the Internet or learned about from third-parties, Muehler provides false and misleading explanations of the order, including, for example: (i) claiming that he has fully paid the monetary sanctions imposed by that order even though he has not, and (ii) claiming that the 2016 SEC Order was a mere "slap on the wrist" that does not limit his ability to provide the promised services, even though it prohibits him from providing the very services he offers to his customers.

99.     Muehler also deceives prospective customers by using false names, signing other peoples' signatures on documents and, on at least one occasion, impersonating Rahimi in a telephone call with a prospective customer.

100.     Muehler uses false names and impersonates others when dealing with prospective customers so those customers are less likely to find negative information about him that is available to the public on the Internet, such as the 2016 SEC Order, and associate it with the AltaVista Companies.

101.   Muehler and the AltaVista Companies know the fraudulent nature of these misrepresentations, omissions, and deceptive acts when engaging in them, and have known their fraudulent nature when engaging in them in the past.  Their fraud is intentional and designed to defraud their customers out of fees and securities.

102.   Muehler's and the AltaVista Companies' fraud was in connection with the purchase or sale of securities, namely, the AltaVista Companies' acquisition of the right to common stock in their customers' businesses, and the proposed sale of customers' preferred stock to investors.

### E.   Examples of Muehler's and The AltaVista Companies' Fraud

103.   The following are examples of Muehler's and the AltaVista Companies' fraudulent activities directed toward their customers.

#### 1.   Company A

104.   Company A is a data protection and equipment security firm that paid Muehler and the AltaVista Companies for services.

105.   Company A is incorporated in Florida and located in Honolulu, Hawaii

106.   Muehler and the AltaVista Companies made false and misleading statements and omissions, and relied on deceptive conduct, to persuade Company A in 2016 to sign an agreement with the AltaVista Companies for broker-dealer and ATS services.

107.   Specifically, over the course of two days in late August 2016, Muehler held in-person meetings with the president and a vice president of Company A near Los Angeles International Airport in Los Angeles, California.

108.   Muehler represented the AltaVista Companies and spoke on their behalf throughout the meetings with the Company A officials.

109.   During the course of those Company A meetings, based on representations made by Muehler in those meetings and in documents provided by Muehler, including in email communications before those meetings, Company A signed an Issuer Agreement with the AltaVista Companies.

110.    In the Company A agreement, the AltaVista Companies agreed to provide broker-dealer services to Company A, including by facilitating an offering of between $3 million and $10 million of Company A preferred stock to investors on the Nanocap Market.

111.    In return, Company A agreed to pay the AltaVista Companies a $20,000 "Underwriter Retainer" fee, a "Broker Dealer Fee" equal to 7.0% of investor funds raised in the proposed offering, and additional fees upon certain milestones in the proposed offering.

112.    Company A paid the initial $20,000 fee to the AltaVista Companies via check on or about August 26, 2016.

113.    Muehler persuaded the president of Company A to make the $20,000 check out to Claudia Muehler so that Claudia Muehler could deposit the check into her personal bank account.

114.    The president of Company A made the check out to Claudia Muehler as instructed by Muehler.

115.    Claudia Muehler deposited the check into her personal bank account.

116.    Through the Company A agreement the AltaVista Companies also acquired the right to an equity stake in Company A.  Specifically, Company A agreed to convey up to 2.5% of Company A's outstanding common stock to the AltaVista Companies upon certain milestones in the proposed offering.

117.    To induce Company A to sign the Company A agreement and agree to compensate the AltaVista Companies (including the right to an equity stake in Company A), Muehler, on behalf of the AltaVista Companies and himself, made untrue statements of material fact, and omitted to state material facts, to the president and vice president of Company A during the meetings with them in August 2016.

118.    Muehler represented that he and the AltaVista Companies have helped small businesses like Company A raise millions of dollars from investors.

119.    This was false because, as Muehler knew at the time, or was reckless in

not knowing, he and the AltaVista Companies have never helped a small business raise millions of dollars – or any significant amount of money – from investors.

120.   Muehler falsely represented that he and the AltaVista Companies had just closed a multi-million-dollar deal that gave the AltaVista Companies access to $3 million to invest in Company A.

121.   Muehler knew at the time, or was reckless in not knowing, that the AltaVista Companies never closed a multi-million-dollar deal and never had any reasonable expectation of investing $3 million in Company A.

122.   Muehler falsely represented, including in documents he drafted and provided to the president of Company A on the AltaVista Companies' behalf, that the AltaVista Companies are a large broker-dealer successfully engaged in funding small businesses.

123.   Muehler knew at the time, or was reckless in not knowing, that the AltaVista Companies operated out of the Muehlers' condominium, never successfully funded a small business, and were not engaged in successfully funding small businesses.

124.   In the Company A agreement, which Muehler drafted and approved for the AltaVista Companies, over which Muehler had ultimate authority, and which Muehler personally provided or caused to be provided to the President of Company A for review during the Company A meetings, Muehler and the AltaVista Companies committed to a Minimum Investment Commitment in Company A of $3 million.

125.   Muehler knew at the time, or was reckless in not knowing, that he and the AltaVista Companies had no reasonable expectation of meeting that commitment.

126.   The Company A agreement further represented that the Nanocap Market "*is an Alternative Trading System Registered with the United States Securities and Exchange Commission.*"  (Emphasis in original.)

127.   Muehler knew at the time, or was reckless in not knowing, that the Nanocap Market never registered with the SEC in any capacity.

128.    Muehler represented that he has experience raising money for small businesses in offerings similar to the offering he and the AltaVista Companies proposed to facilitate for Company A, but did not disclose the 2016 SEC Order, the 2010 California order, or the 2009 Minnesota order to Company A, even though Muehler was aware of all three orders at the time.

129.    Muehler made these false and misleading statements and omissions, and employed the deceptive conduct stated above, in order to persuade Company A to sign the Company A agreement.

130.    Muehler knew, or was reckless in not knowing, that each of those statements and omissions were false and misleading.

131.    The material misrepresentations and omissions stated above, including Muehler's omissions concerning the 2016 SEC Order, the 2010 California order, and the 2009 Minnesota order, were important to Company A's decision to sign the Company A agreement, by which it agreed to convey a portion of Company A's outstanding common stock to the AltaVista Companies.

132.    Muehler and the AltaVista Companies made these misstatements and omissions in connection with the purchase of securities, that is, to convince Company A to sign an Issuer Agreement, through which the AltaVista Companies acquired the right to Company A common stock and agreed to purchase Company A preferred stock.

## 2.    Company B

133.    Company B, a clean coal technology company incorporated in Delaware and located in Tennessee, signed an Issuer Agreement with the AltaVista Companies on or about July 13, 2016.  In the Company B agreement, the AltaVista Companies agreed to provide broker-dealer services, including facilitating a $50 million offering of Company B preferred stock to investors.  In return, Company B agreed to pay fees, and the AltaVista Companies acquired the right to a percentage of Company B's outstanding common stock.

134.   Muehler and the AltaVista Companies relied on false and misleading statements and omissions, and deceptive conduct, to persuade Company B to sign the Company B agreement.

135.   On or about May 17, 2016, Muehler sent the President of Company B a proposed agreement between the AltaVista Companies and Company B.  Muehler drafted and personally sent the proposed agreement, or caused it to be sent, to Company B, and Muehler had ultimate authority over the statements made in that agreement.

136.   The proposed agreement represented that the AltaVista Companies are experienced with corporate securities compliance and fraud and risk management for U.S. and international companies.

137.   These representations were important to Company B's decision to do business with the AltaVista Companies.

138.   Muehler made the representations to Company B even though he knew, or was reckless in not knowing, they were false and misleading, given that the AltaVista Companies had no meaningful experience with corporate securities compliance or with fraud and risk management for issuers, and given that Muehler's true experience includes his numerous securities-law violations and the sanctions imposed against him by the Commission and state securities regulators.

139.   On or about July 1, 2016, before Company B signed the Company B agreement, Muehler sent an email to the president of Company B in which Muehler represented that the AltaVista Companies were successfully issuing fixed-income securities and moving into an office in the U.S. Bank Tower in Los Angeles, California.

140.   Muehler made these representations even though he knew, or was reckless in not knowing, that the AltaVista companies were not successfully issuing fixed-income securities and were not moving into an office in the U.S. Bank Tower.

141.   On or about July 12, 2016, before Company B signed the Company B

agreement, Muehler met with the president of Company B in person in Marina Del Rey, California.  At the time of that meeting, Company B was considering working with the AltaVista Companies in an effort to raise capital from investors.

142.   At the Company B meeting, Muehler represented to the president of Company B that the AltaVista Companies had $50 million available to invest in Company B.

143.   Muehler made this representation even though he knew, or was reckless in not knowing, that the AltaVista Companies had minimal assets, did not have $50 million available to invest in Company B, and had no reasonable expectation of obtaining $50 million or even a small fraction of that amount to invest in Company B.

144.   At the Company B meeting, Muehler sought to prevent the recently-issued 2016 SEC Order from hindering his efforts to solicit Company B by representing that, although he had recently been "fined" by the SEC, he was in good standing with the SEC and that the 2016 SEC Order was a mere slap on the wrist.

145.   The representations were false and misleading, among other reasons, because Muehler was not in good standing with the SEC and because the 2016 SEC Order found Muehler to have committed securities fraud and bars him from providing the services he offered to Company B.

146.   Muehler knew, or was reckless in not knowing, the misrepresentations were false and misleading and made them in order to persuade Company B to do business with the AltaVista Companies.

147.   At the Company B meeting, Muehler further represented to the president of Company B that Muehler had paid everything he owed to the SEC under the 2016 SEC Order.

148.   The representation was false because, as Muehler knew at the time, or was reckless in not knowing, he had not paid any of the amounts due under the 2016 SEC Order.

149.   At the Company B meeting and during subsequent, interstate telephone

calls during approximately June 2016, before Company B signed the Company B agreement, Muehler represented to the president of Company B that Muehler has successfully raised investor funds for customers in the past and could do the same for Company B.

150.   Muehler made these representations even though he knew, or was reckless in not knowing, they were false and misleading, given that Muehler has never facilitated a successful investor offering for a customer and is subject to the 2016 SEC Order, which bars him from operating the AltaVista Scheme.

151.   When soliciting Company B to sign the Company B agreement, Muehler also failed to disclose the California and Minnesota orders, and failed to give Company B a full and accurate explanation of the 2016 SEC Order, with the intent of persuading Company B to sign the agreement.

152.   After signing the Company B agreement, per Muehler's instructions, Company B sent $5,000 via wire transfer to Claudia Muehler as an initial payment of fees to the AltaVista Companies.

153.   All of the misrepresentations and omissions stated above were important to Company B's decision to sign the Company B agreement, by which it agreed to convey a portion of Company B's outstanding common stock to the AltaVista Companies.

154.   Muehler and the AltaVista Companies made these misstatements and omissions in connection with the purchase of securities, that is, to convince Company B to sign an Issuer Agreement, through which the AltaVista Companies acquired the right to Company B common stock and agreed to purchase Company B preferred stock.

### 3.    Company C

155.   Company C, an organic food delivery service and Delaware corporation based in Brazil, signed an agreement with the AltaVista Companies on or about November 16, 2016.

156.   The Company C agreement became effective upon the AltaVista Companies' execution of that agreement in Marina Del Rey, California.

157.   After signing the Company C agreement with the AltaVista Companies, Company C paid the AltaVista Companies approximately $20,000 in fees.

158.   In the Company C Agreement, the AltaVista Companies agreed to provide broker-dealer services to Company C, including facilitating a $6 million offering of Company C preferred stock to investors on the Nanocap Market.  In return, Company C agreed to pay tens of thousands of dollars in fees, including an initial $10,000 fee, and the AltaVista Companies acquired the right to receive up to 5.0% of Company C's common stock upon the occurrence of certain milestones in the proposed offering.

159.   Muehler and the AltaVista Companies made untrue statements of material fact, and omitted to state material facts, and engaged in deceptive conduct, to persuade Company C to sign the Company C agreement.

160.   On or about October 6, 2016, before Company C signed the Company C agreement, Muehler sent the CEO of Company C an email solicitation on behalf of the AltaVista Companies.

161.   The Company C solicitation email described the AltaVista Companies as an "Investment Banking firm" that invests directly in startup companies from its "Fixed Income Fund."

162.   The representation was false and misleading because, as Muehler knew at the time, or was reckless in not knowing, the AltaVista Companies had never invested in a startup company through a Fixed Income Fund or otherwise acted as an investment banker for a successful offering, and none of the putative investment funds associated with the AltaVista Companies had investors or money to invest.

163.   The Company C solicitation further represented that the AltaVista Companies have relationships with numerous potential investors, including registered broker-dealers, registered investment advisory firms, family offices, venture capital

firms, investment bankers, and underwriters.

164.   The representation was false and misleading because, as Muehler knew, or was reckless in not knowing, the AltaVista Companies did not have the claimed relationships.

165.   On or about October 6, 2016, before Company C signed the Company C agreement, Muehler sent marketing materials about the AltaVista Companies to the CEO of Company C.

166.   Muehler created these marketing materials based, in part, on marketing materials he used during the ASMG Scheme.  He had ultimate control over the marketing materials, including who received them.

167.   The Company C marketing materials described AV Private Client as a FINRA-registered investment adviser.

168.   The representation was false and misleading because AV Private Client was never registered with FINRA.

169.   Muehler knew, or was reckless in not knowing, the representation was false and misleading when he sent these marketing materials to the CEO of Company C.

170.   The marketing materials further described the AltaVista Companies as having seventeen "Private Equity Investment Funds" and one "Federal Fixed Income Mortgage Fund" through which the AltaVista Companies could make investments in their customers.

171.   As Muehler knew, or was reckless in not knowing, that representation was false and misleading because none of the funds had any assets, investors, or funds to invest.

172.   The marketing materials further described the Nanocap Market as an ATS registered with the SEC.

173.   As Muehler knew, or was reckless in not knowing, that representation was false and misleading because the Nanocap Market never registered with the SEC

1  in any capacity.

2    174.   The marketing materials further described the Nanocap Market as

3  standing for "Integrity and Ethical practices in order to enhance investor confidence

4  in Alternative Securities and Alternative Investments."

5    175.   As Muehler knew, or was reckless in not knowing, that representation

6  was false and misleading because the AltaVista Companies were controlled by

7  Muehler, who admitted that he had committed securities fraud and broker-dealer

8  violations in his previous scheme, and who was operating the AltaVista scheme in

9  violation of the 2016 SEC Order.

10    176.   Following the Company C solicitation and the marketing materials,

11  Muehler provided the CEO of Company C with the Company C agreement, which

12  Muehler personally created, and which Company C and the AltaVista Companies

13  subsequently signed.

14    177.   The Company C agreement stated that the Nanocap market is an ATS

15  registered with the SEC.

16    178.   As Muehler knew, or was reckless in not knowing, that representation

17  was false because the Nanocap Market never registered with the SEC in any capacity.

18    179.   In the Company C agreement, in addition to providing broker-dealer

19  services, the AltaVista Companies committed to providing at least $2 million in

20  capital to Company C.

21    180.   As Muehler knew, or was reckless in not knowing, that commitment was

22  false and misleading because the AltaVista Companies had minimal assets, no

23  investors, and no reasonable expectation of fulfilling that commitment.

24    181.   On or about November 16, 2016, Muehler caused the AltaVista

25  Companies to enter into the Company C agreement by using another person's name

26  for the signature page.  Muehler did not sign the Company C agreement under his real

27  name in order to hide his personal involvement with the AltaVista Companies from

28  the CEO of Company C, and with the purpose of preventing the CEO of Company C

from finding negative information about Muehler that is publicly available on the Internet, including the 2016 SEC Order, and associating that information with the AltaVista Companies.

182.   Prior to the Company C agreement, Muehler marketed the AltaVista Companies to the CEO of Company C without ever disclosing the 2016 SEC Order, or the California and Minnesota cease-and-desist orders.

183.   After the AltaVista Companies and Company C entered into the Company C agreement, Muehler continued to hide his identity from the CEO of Company C by identifying himself as "Steven Leite" and using that name, instead of his real name, in correspondence with the CEO of Company C.  Muehler used a false name in order to hide his personal involvement with the AltaVista Companies – and negative information about him that is publicly available on the Internet, including the 2016 SEC Order – from the CEO of Company C.

184.   After the AltaVista Companies and Company C entered into the Company C agreement, Muehler intentionally misled the CEO of Company C about Company C's chances of raising money through a lawful offering, including by representing that Muehler has a good relationship with the SEC.

185.   As Muehler knew, or was reckless in not knowing, that representation was false and misleading because Muehler was not in good standing with the SEC.

186.   On or about December 26, 2016, Muehler emailed the CEO of Company C with false and misleading accusations that a document provided to the AltaVista Companies by Company C had caused a fraudulent filing with the SEC, that the filing could result in an investigation of Company C by the U.S. Department of Justice, and that failing to fix the filing would cause the Company C offering to fail.

187.   After making these false and misleading accusations, by which Muehler intended to scare and threaten the CEO of Company C, Muehler demanded $5,000 from Company C to fix the putative problem.

188.   Company C paid the $5,000 to the AltaVista Companies based on

Muehler's representations and in hopes of lawfully pursuing the agreed-upon securities offering.

189.   Muehler knew, or was reckless in not knowing, the representations were false and misleading when he made them.  He made the representations to persuade Company C to continue doing business with the AltaVista Companies, to create the false impression that the AltaVista Companies were highly concerned with legal compliance, to create the false impression that Company C or its CEO could face criminal liability in the United States if the problem were not fixed, and to obtain $5,000 from Company C.

190.   In early January 2017, Muehler and the AltaVista Companies sought to replace the Company C agreement with a new agreement between the AltaVista Companies and Company C.

191.   Claudia Muehler assisted Muehler in soliciting Company C for this new agreement, including by speaking with the CEO of Company C in Portuguese during at least one telephone call in which she described Muehler as experienced with the SEC and able to facilitate a proposed securities offering for Company C.

192.   In early January 2017, the CEO of Company C learned of the 2016 SEC Order from a third-party.  He was not aware of the 2016 SEC Order before that time and asked Claudia Muehler about it during a telephone call in early January 2017.

193.   Although Claudia Muehler knew about the 2016 SEC Order and its terms, she referred the CEO of Company C to Muehler for an explanation.

194.   In early January 2017, over the telephone, Muehler represented to the CEO of Company C that he had paid what he owed to the SEC under the 2016 SEC Order, that the 2016 SEC Order was merely a misunderstanding that he had fixed with the SEC, and that he was again in good standing with the SEC.  Muehler further represented that the AltaVista Companies could lawfully facilitate the proposed securities offering for Company C.

195.   As Muehler knew, or was reckless in not knowing, these representations

were false and misleading because Muehler had not paid any of the amounts due under the 2016 SEC Order, was not in good standing with the SEC, and was violating the 2016 SEC Order through the AltaVista Scheme.

196.    In early January 2017, Muehler provided new marketing materials about the AltaVista Companies to the CEO of Company C.

197.    Muehler created the new marketing materials and sent, or approved them to be sent, to the CEO of Company C.

198.    The new marketing materials included false and misleading representations, including that the Nanocap Market was an SEC-registered ATS.

199.    Muehler knew, or was reckless in not knowing, that representation was false, and that the Nanocap Market has never been registered with the SEC.

200.    On or about January 9, 2017, after the CEO of Company C reviewed the new marketing materials, Company C and the AltaVista Companies entered into a second agreement.

201.    Muehler created the second agreement, and Claudia Muehler either signed it or permitted Muehler to sign her name on behalf of the AltaVista Companies.

202.    In the second agreement, the AltaVista companies agreed to provide broker-dealer services to Company C, including facilitating a $6 million securities offering.  In return, Company C agreed to convey up to 4.0% of its common stock to the AltaVista Companies based on certain milestones in the proposed offering.

203.    The second agreement, which the CEO of Company C received and reviewed before he signed it, contained false and misleading statements, including that the Nanocap Market is an ATS registered with the SEC, and a false and misleading commitment that the AltaVista Companies would provide at least $3 million in funding to Company C if that amount were not raised from investors.

204.    These representations were false and misleading because, as Muehler knew, or was reckless in not knowing, the Nanocap Market was not registered with

1   the SEC in any capacity and the AltaVista Companies had no reasonable expectation
2   of fulfilling the $3 million commitment.

3       205.   Muehler marketed the AltaVista Companies to the CEO of Company C
4   without ever disclosing the 2010 California order or the 2009 Minnesota order, even
5   though Muehler knew about both orders throughout the time he operated the
6   AltaVista Companies.

7       206.   The misrepresentations and omissions stated above were important to
8   Company C's decision to sign the agreement, by which it agreed to convey a portion
9   of Company C's outstanding common stock to the AltaVista Companies.

10      207.   Muehler and the AltaVista Companies made these misstatements and
11  omissions in connection with the purchase of securities, that is, to convince Company
12  C to sign an Issuer Agreement, through which the AltaVista Companies acquired the
13  right to Company C common stock and agreed to purchase Company C preferred
14  stock.

15              **4.    Company D**

16      208.   Company D, an aquaculture company incorporated in Oregon and
17  located in Neskowin, Oregon, signed an agreement with the AltaVista Companies on
18  or about July 27, 2016.

19      209.   In the Company D agreement, the AltaVista Companies agreed to
20  provide broker-dealer services to Company D, including by facilitating a $1.2 million
21  offering of Company D preferred stock to investors on the Nanocap Market.  In
22  return, Company D agreed to pay fees, including a "BROKER DEALER FEE" equal
23  to 7.0% of the funds raised in the offering, and the AltaVista Companies acquired the
24  right to receive up to 2.5% of Company D's common stock.

25      210.   Claudia Muehler signed the Company D agreement on behalf of the
26  AltaVista Companies, or permitted Muehler to sign her name on that agreement.

27      211.   Company D paid the AltaVista Companies approximately $10,000 in
28  fees.

212.   Muehler and the AltaVista Companies made false and misleading statements and omissions, and engaged in deceptive conduct, to persuade Company D to sign the agreement.

213.   On or about July 26, 2016, before the Company D agreement, Muehler and the AltaVista Companies sent the CEO of Company D an email solicitation in which the AltaVista Companies offered to assist Company D in raising money from investors.

214.   Muehler personally prepared the solicitation materials and either personally sent, or caused them to be sent, to the CEO of Company D.

215.   The Company D solicitation materials represented that the Nanocap Market is an SEC-registered ATS used by registered broker-dealers, registered investment advisors, high net-worth investors, venture capital firms, family offices, and other potential investors.

216.   As Muehler knew, or was reckless in not knowing, those representations were false and misleading because the Nanocap Market never registered with the SEC in any capacity and was never used by any of the claimed firms or individuals.

217.   On or about July 26, 2016, Muehler and the AltaVista Companies emailed the CEO of Company D an unsigned copy of the Company D agreement as an attachment to the solicitation materials.

218.   Muehler personally prepared the Company D agreement and personally sent, or authorized it to be sent, to the CEO of Company D.

219.   The Company D agreement represented that the Nanocap Market is an ATS registered with the SEC.

220.   As Muehler knew, or was reckless in not knowing, that representation was false and misleading because the Nanocap Market never registered with the SEC in any capacity.

221.   In the Company D agreement, the AltaVista Companies committed to providing at least $200,000 in funding to Company D.

222.   As Muehler knew, or was reckless in not knowing, that commitment was false and misleading because the AltaVista Companies had minimal assets to invest in Company D and had no reasonable expectation of meeting the commitment.

223.   In early December 2016, a third-party whom the CEO of Company D believed he had reason to distrust, sent the CEO of Company D a link to the 2016 SEC Order via email.  The CEO of Company D forwarded that email to Muehler and asked for an explanation.

224.   Muehler responded to the CEO of Company D's email, on or about December 10, 2016, with an email signed "Mr. Koorosh 'Danny' Rahimi."  Although it was purportedly signed by Defendant Rahimi, Muehler personally prepared and sent that email.  He put Rahimi's name at the bottom of the email in order to mislead the CEO of Company D about its sender.

225.   That email represented that Muehler was never a part of the AltaVista Companies.  It represented that, instead, Muehler was an independent contractor who only provided services that the SEC permitted him to provide.

226.   Based on the representations in that email and his distrust of the third-party who had sent him a link to the 2016 SEC Order, the CEO of Company D came to believe the third-party had sent him bad information about the AltaVista Companies.

227.   The representations in that email, however, were false and misleading because, as Muehler knew upon drafting and sending the email, or was reckless in not knowing, he was a co-founder of the AltaVista Companies, he controlled the AltaVista Companies, and he was conducting the AltaVista Companies in violation of the 2016 SEC Order.

228.   Muehler personally drafted and sent that email in order to mislead the CEO of Company D so that Company D would continue to do business with the AltaVista Companies.

229.   On or around the time of that email, Muehler and the AltaVista

Companies proposed a second agreement between Company D and the AltaVista Companies and sent the CEO of Company D a copy of that proposed agreement. Muehler personally prepared the second agreement and caused it to be sent to the CEO of Company D.

230.   In the second agreement, the AltaVista Companies offered to provide broker-dealer services to Company D, including facilitating an offering of up to $12 million of Company D stock to investors.  In return, upon executing the agreement, Company D would agree to pay fees, including a percentage of funds raised from investors on the Nanocap Market, and the AltaVista Companies would acquire the right to common stock in Company D.

231.   In the second agreement, the AltaVista Companies also committed to raising at least $250,000 for Company D.

232.   As Muehler knew, or was reckless in not knowing, the representation was false and misleading because the AltaVista Companies had minimal assets and no reasonable expectation of meeting the commitment.

233.   In order to persuade the CEO of Company D to sign the second agreement, Muehler participated in a telephone call on behalf of the AltaVista Companies with the CEO of Company D and other representatives of Company D.

234.   At the start of that call, which occurred shortly before Company D signed the second agreement, Muehler introduced himself as Danny Rahimi and proceeded to impersonate Rahimi throughout the call.

235.   Muehler impersonated Rahimi during the call in order to hide his own involvement with the AltaVista Companies from the CEO of Company D, so the CEO of Company D would not associate negative information about Muehler that is publicly available on the Internet, including the 2016 SEC Order, with the AltaVista Companies, and so the CEO of Company D would believe he was speaking with a representative of the AltaVista Companies with experience in the securities industry.

236.   During that call, Muehler guaranteed to the CEO of Company D that the

AltaVista Companies would meet the minimum investment commitment stated in the proposed agreement with Company D.

237.   The guarantee was false and misleading because, as Muehler knew, or was reckless in not knowing, the AltaVista Companies had no reasonable expectation of meeting it.

238.   During the call, Muehler represented to the CEO of Company D that the AltaVista Companies had business relationships with numerous investors, including investors who were ready to invest in Company D.

239.   Muehler further represented that the AltaVista Companies had connections with accredited investors who would invest in Company D if necessary to meet the AltaVista Companies' minimum investment guarantee.

240.   As Muehler knew, or was reckless in not knowing, these representations were false and misleading because the AltaVista Companies did not have business relationships with any investors, had not identified investors who were prepared to invest in Company D, and did not have business relationships with accredited investors who were interested in Company D's securities.

241.   During the call, Muehler represented to the CEO of Company D that the AltaVista Companies were experienced and able to facilitate the proposed securities offering and had raised millions of dollars for customers in the past.

242.   As Muehler knew, or was reckless in not knowing, neither he nor the AltaVista Companies had ever facilitated any successful offerings or raised millions of dollars – or anything approaching that amount – for any of their customers.

243.   Shortly after the call, Muehler sent the CEO of Company D an email using the false name "Steven Leite" and urged Company D to sign the second agreement.

244.   Muehler used the false name  to confuse the CEO of Company D about Muehler's involvement with the AltaVista Companies and, relatedly, so that Company D would sign the second agreement despite having received a link to the

2016 SEC Order.

245. Company D signed the second agreement on or about December 27, 2016.

246. Claudia Muehler signed the agreement, or permitted Muehler to sign her name on the agreement, for the AltaVista Companies.

247. When soliciting Company D, Muehler and the AltaVista Companies never disclosed the 2010 California order or the 2009 Minnesota order, and never gave Company D a full and accurate explanation of the 2016 SEC Order.

248. Muehler and the AltaVista Companies intentionally chose not to disclose those orders because they believed Company D would not do business with them if Muehler's true experience in the securities industry were disclosed.

249. All of the misrepresentations and omissions stated above were important to Company D's decision to sign the agreement, by which it agreed to convey a portion of Company D's outstanding common stock to the AltaVista Companies.

250. Muehler and the AltaVista Companies made these misstatements and omissions in connection with the purchase of securities, that is, to convince Company D to sign an Issuer Agreement, through which the Alta Vista Companies acquired the right to Company D common stock and agreed to purchase Company D preferred stock.

### F.    The Unregistered AltaVista Bond Offering

251. In 2016, in an effort to raise money for themselves and their issuer customers, Muehler and the AltaVista Companies solicited investors to purchase bonds to be issued by one or more of the AltaVista Investment Funds (the "AltaVista Bonds").

252. The offer and sale of the AltaVista Bonds was not registered with the SEC or exempt from registration.

253. The bonds were offered in interstate commerce, including through the use of interstate telephone calls.

254. Specifically, Muehler and the AltaVista Companies planned for one or more of the Alta Vista Investment Funds to issue the AltaVista Bonds to raise money so that they could meet the Minimum Investment Commitments made to their issuer customers.

255. Muehler also expected to take a portion of the funds raised for himself, either directly or through Claudia Muehler.

256. Muehler was a necessary participant and substantial factor in the offering of the AltaVista Bonds. Among other things, he was the one who formulated the plan for the offering, created the sales scripts to be used with potential investors, and located and provided leads, including names and telephone numbers of potential investors, to Rahimi for purposes of selling the AltaVista Bonds.

257. Rahimi was also a necessary participant and substantial factor in the offering of the AltaVista Bonds. Among other things, he acted as the primary salesman in connection with that offering, and used Muehler's solicitation materials, scripts and list of potential investors in offering the bonds to potential investors.

### G.     Claudia Muehler's Role in the Fraud

258. Claudia Muehler lived with Muehler during both the ASMG Scheme and the AltaVista scheme that is the subject of this Complaint.

259. She discussed the SEC enforcement proceedings regarding the ASMG Scheme with him during the course of those proceedings, and learned that Muehler agreed to settle those proceedings shortly after he agreed to do so.

260. Claudia Muehler reviewed a copy of the 2016 SEC Order shortly after the SEC served it on Muehler, on or about June 21, 2016, at the condominium she shares with Muehler in Marina Del Rey, California.

261. Claudia Muehler discussed the 2016 SEC Order with Muehler upon reviewing it and knew, or was reckless in not knowing, its contents, including that it: (i) found Muehler to have committed securities fraud and acted as an unregistered broker-dealer in connection with his operation of the ASMG Companies; (ii) ordered

Muehler to pay over $410,000 in disgorgement and penalties; and (iii) imposed the cease and desist requirements, the associational bar, the penny stock bar, and the officer and director bar against Muehler.

262.   Despite her knowledge, or reckless disregard, of the 2016 SEC Order and its provisions, Claudia Muehler substantially assisted and continues to assist Muehler in violating its terms, and in committing new securities-law violations, including by co-founding and funding the AltaVista Companies and signing agreements for the AltaVista Companies with their small business customers.

263.   Claudia Muehler provided substantial assistance to Muehler in founding and operating the AltaVista Scheme, because, for example:

(a)   she helped Muehler start the AltaVista Companies by formally organizing AV Private Client and AV Securities in late 2015;

(b)   she agreed to serve as agent for service of process for each of the three companies, including for AV Capital Markets;

(c)   she provided funding for the AltaVista Companies' expenses, including by using her credit card, or permitting Muehler to use her credit card, to pay such expenses, from late 2015 to the present;

(d)   she paid for the AltaVista Companies' email services and websites, and for investor leads;

(e)   she has helped to identify potential customers for the AltaVista Companies using the Internet;

(f)   she has collected and deposited customer fees, signed Customer Agreements, and allowed Muehler to sign Customer Agreements using her name on behalf of the AltaVista Companies; and

(g)   she has used her ability to speak Portuguese to persuade a potential customer to sign with the AltaVista Companies.

264.   Claudia Muehler considers herself a co-owner and operator of the AltaVista Companies, along with Muehler.

265.   Claudia Muehler substantially assisted Muehler in operating the AltaVista Scheme even though she knew, or was reckless in not knowing, that the scheme was substantially similar to Muehler's ASMG Scheme, which she knew, or was reckless in not knowing, resulted in the 2016 SEC Order and its prohibitions.

266.   Claudia Muehler substantially assisted Muehler in violating the 2016 SEC Order, even though she knew about that order and its prohibitions, and knew, or was reckless in not knowing, that Muehler's conduct in the AltaVista Scheme violated that order.

267.   Claudia Muehler has provided substantial assistance to Muehler, and continues to help Muehler run the AltaVista Companies today, in order to personally profit from the AltaVista Companies' customers, including by personally taking fees paid by those customers as personal remuneration.

## H.   Rahimi's Role in the Illegal Conduct

268.   Rahimi worked with the AltaVista Companies from approximately March 2016 until approximately February 2017, during which time Rahimi was located in Los Angeles, California.

269.   Rahimi previously held Series 6, 7, 31, 63, and 66 securities licenses.

270.   Those licenses expired two years after the termination of Rahimi's last association with an entity registered with the SEC, in approximately September 2016.

271.   Muehler brought Rahimi into the AltaVista Companies so Muehler could advertise Rahimi's securities-related experience to potential customers and use Rahimi's name when soliciting potential customers.

272.   During his time with the AltaVista Companies, Rahimi helped the AltaVista Companies solicit potential small business customers through interstate telephone calls.

273.   During 2016, Rahimi also helped solicit investors for the unregistered AltaVista Bond offering.

274.   Rahimi personally called investors, and did so on behalf of the AltaVista

Companies.  He also personally solicited potential investors in the AltaVista Bonds and attempted to persuade those investors to purchase the AltaVista Bonds.  He solicited the investors using marketing materials provided to him and prepared by Muehler for that purpose.

275.   Rahimi cold-called as many as 100 people in interstate telephone calls to persuade them to buy the AltaVista Bonds.  During those calls, he described the proposed investment to potential investors.

276.   In soliciting investors for that unregistered bond offering, Rahimi used the leads purchased by Muehler and Claudia Muehler.  He also used solicitation materials prepared and provided to him by Muehler for that purpose.

277.   Rahimi expected to receive a portion of any funds raised through the sale of the unregistered bonds.

## FIRST CLAIM FOR RELIEF

### Fraud In Connection With The Purchase Or Sale Of Securities:
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against Muehler and the AltaVista Companies)

278.   The SEC realleges and incorporates by reference paragraphs 1 through 277 above.

279.   Muehler and the AltaVista Companies made material misrepresentations and omissions, and engaged in a scheme to defraud, in connection with the purchase and sale of securities. To persuade small businesses to sign-up for their broker-dealer services, Muehler and his AltaVista Companies make false and misleading statements, including false claims that they previously helped small businesses raise millions of dollars, that they have $50 million on-hand to invest in their customers' securities, and that some AltaVista Companies are registered with the Commission. They also fail to disclose the 2016 SEC Order, the 2010 California order and the 2009 Minnesota order.  Muehler and his companies also engaged in deceptive conduct in carrying out this fraud, using false personas in emails, impersonating others on

telephone calls, and forging documents.

280.   By engaging in the conduct described above, defendants Muehler and the Alta Vista Companies, and each of them, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

281.   Defendants Muehler and the Alta Vista Companies, and each of them, knew, or was reckless in not knowing, that he or they employed devices, schemes or artifices to defraud, made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and engaged in acts, practices, or courses of business that operated as a fraud upon other persons by the conduct described in detail above.

282.   By engaging in the conduct described above, defendants Muehler and the Alta Vista Companies, and each of them, violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

## **SECOND CLAIM FOR RELIEF**

### **Failure To Register As A Broker-Dealer:**

### **Violations of Section 15(a) of the Exchange Act**

### **(Against Muehler, the AltaVista Companies, and Rahimi)**

283.   The SEC realleges and incorporates by reference paragraphs 1 through 277 above.

284.   Muehler, the AltaVista Companies and Rahimi acted as unregistered brokers by offering and agreeing to provide broker-dealer services in exchange for transaction-based compensation, including a percentage of funds raised.

285.   Muehler, the AltaVista Companies, and Rahimi, and each of them, by engaging in the conduct described above, directly or indirectly, made use of the mails or means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce, the purchase or sale of securities, without being registered as a broker or dealer in accordance with Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

286.   By engaging in the conduct described above, Muehler, the AltaVista Companies, Rahimi, and each of them violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)] and, unless restrained and enjoined, Muehler, the AltaVista Companies, Rahimi, and each of them will continue to violate Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## THIRD CLAIM FOR RELIEF

### Violations of Exchange Act Section 15(b)(6)(B)(i)

### (Against Muehler)

287.   The SEC realleges and incorporates by reference paragraphs 1 through 277 above.

288.   As of June 21, 2016, an order under Section 15(b)(6)(A) of the Exchange Act was in effect with respect to Muehler (the 2016 SEC Order), and such order barred Muehler from associating with a broker or dealer and from participating in the offer of a penny stock.

289.   At all relevant times, the AltaVista Companies met the definition of broker or dealer for purposes of the 2016 SEC Order.

290.   At all relevant times, the securities that the AltaVista Companies and Muehler proposed to help sell for their issuer customers, and to acquire from their issuer customers, were penny stocks for purposes of the Exchange Act and the 2016

SEC Order.

291.   By engaging in the conduct described above, Muehler willfully associated with a broker-dealer in contravention of such order and participated in penny stock offerings in contravention of such order without the consent of the Securities and Exchange Commission.

292.   By engaging in the conduct described above, Muehler violated Section 15(b)(6)(B)(i) of the Exchange Act [15 U.S.C. § 78o(b)(6)(B)(i)].

## FOURTH CLAIM FOR RELIEF

### Offer Of Unregistered Securities:

### Violations of Securities Act Section 5(c)

### (Against Muehler, the AltaVista Companies, and Rahimi)

293.   The SEC realleges and incorporates by reference paragraphs 1 through 277 above.

294.   The 2016 offer and sale of the Alta Vista Bonds was not registered with the SEC, and no exemption from registration applies.

295.   Muehler, the AltaVista Companies, and Rahimi, and each of them, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell securities.

296.   By engaging in the conduct described above, Muehler, the AltaVista Companies, Rahimi, and each of them violated Section 5(c) of the Securities Act [15 U.S.C. § 77e(c)] and, unless restrained and enjoined, Muehler, the AltaVista Companies, Rahimi, and each of them will continue to violate Section 5(c) of the Securities Act [15 U.S.C. § 77e(c)].

## FIFTH CLAIM FOR RELIEF

## Aiding And Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5

### (Against Claudia Muehler)

297.   The SEC realleges and incorporates by reference paragraphs 1 through

277 above.

298.   Defendants Muehler, the AltaVista Companies, and each of them violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder through the conduct described above and in the First Claim For Relief, above.

299.   Claudia Muehler funded the AltaVista Companies, was a co-owner and operator of those companies, identified potential customers, deposited issuer payments, allowed Muehler to sign her name on Customer Agreements, and persuaded and attempted to persuade issuer customers to sign with Muehler and the AltaVista Companies.

300.   Claudia Muehler was also aware of the 2016 SEC Order and knew or was reckless in not knowing the unlawful nature of the AltaVista Companies' business and its substantial similarity to the ASMG Scheme.

301.   By engaging in the conduct described above, Claudia Muehler knowingly or recklessly provided substantial assistance to Muehler, the AltaVista Companies, and each of them in their violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and unless restrained and enjoined will continue to aid and abet violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## SIXTH CLAIM FOR RELIEF

### Aiding And Abetting Violations of Exchange Act Section 15(a)

### (Against Claudia Muehler)

302.   The SEC realleges and incorporates by reference paragraphs 1 through 277 above.

303.   Defendants Muehler, the AltaVista Companies, and each of them, violated Section 15(a) of the Exchange Act through the conduct described above and in the Second Claim For Relief, above.

304.   Claudia Muehler funded the AltaVista Companies, was a co-owner and operator of those companies, identified potential customers, deposited issuer payments, allowed Muehler to sign her name on Customer Agreements, and

persuaded and attempted to persuade issuer customers to sign with Muehler and the AltaVista Companies.

305.   Claudia Muehler was also aware of the 2016 SEC Order and knew or was reckless in not knowing the unlawful nature of the AltaVista Companies' business and its substantial similarity to the ASMG Scheme.

306.   By engaging in the conduct described above, Claudia Muehler knowingly or recklessly aided and abetted Muehler's and the AltaVista Companies' violations of Section 15(a) of the Exchange Act and, unless restrained and enjoined, will continue to aid and abet violations of Section 15(a) of the Exchange Act.

## SEVENTH CLAIM FOR RELIEF

### Aiding And Abetting Violations of Exchange Act Section 15(b)(6)(B)(i)
### (Against Claudia Muehler)

307.   The SEC realleges and incorporates by reference paragraphs 1 through 277 above.

308.   Defendant Muehler violated Section 15(b)(6)(B)(i) of the Exchange Act through the conduct described above and in the Third Claim For Relief, above.

309.   Claudia Muehler funded the AltaVista Companies, was a co-owner and operator of those companies, identified potential customers, deposited issuer payments, allowed Muehler to sign her name on Customer Agreements, and persuaded and attempted to persuade issuer customers to sign with Muehler and the AltaVista Companies.

310.   Claudia Muehler also aware of the 2016 SEC Order and knew or was reckless in not knowing the unlawful nature of the AltaVista Companies' business and its substantial similarity to the ASMG Scheme.

311.   Claudia Muehler knowingly or recklessly provided substantial assistance to Muehler in his violations of Section 15(b)(6)(B)(i) of the Exchange Act.

312.   By engaging in the conduct described above, Claudia Muehler aided and abetted Muehler's violations of Section 15(b)(6)(B)(i) of the Exchange Act and,

unless restrained and enjoined, will continue to aid and abet violations of Section 15(b)(6)(B)(i) of the Exchange Act.

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that the Defendants committed the alleged violations.

### **II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure:

(1)     preliminarily and permanently enjoining Muehler, and his agents, servants, employees, and attorneys, and those persons in active concert or participation with him, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 5(c) of the Securities Act [15 U.S.C. § 77e(c)], Sections 10(b), 15(a), and 15(b)(6)(B)(i) of the Exchange Act [15 U.S.C. §§ 78j(b), 78o(a), 78o(b)(6)(B)(i)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(2)     preliminarily and permanently enjoining each of the AltaVista Companies, and each of their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 5(c) of the Securities Act [15 U.S.C. § 77e(c)], Sections 10(b) and 15(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78o(a)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(3)     preliminarily and permanently enjoining Claudia Muehler, and her agents, servants, employees, and attorneys, and those persons in active concert or participation with her, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 10(b), 15(a), and

15(b)(6)(B)(i) of the Exchange Act [15 U.S.C. §§ 78j(b), 78o(a), 78o(b)(6)(B)(i)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

(4)     permanently enjoining Rahimi, and his agents, servants, employees, and attorneys, and those persons in active concert or participation with him, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 5(c) of the Securities Act [15 U.S.C. § 77e(c)] and Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## III.

Issue an order:

(1)     requiring Muehler, the AltaVista Companies, and Claudia Muehler to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon, on a joint-and-several basis with one another; and

(2)     requiring Rahimi to disgorge all funds received from his illegal conduct, together with prejudgment interest thereon.

## IV.

Order Muehler, the AltaVista Companies, Rahimi, and Claudia Muehler to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## V.

Order Muehler to pay an additional civil penalty under Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), for violations of the cease and desist order entered against him by the Commission on June 21, 2016.

## VI.

Issue a judgment, consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Muehler from directly or indirectly, including, but not limited to, through any entity owned or controlled by Muehler, participating in the issuance, purchase, offer, or sale of any securities, provided, however, that such injunction shall not prevent Muehler from purchasing or selling securities listed on a

national securities exchange for his own personal account.

## VII.

Issue an order barring the AltaVista Companies, Claudia Muehler, and Rahimi from participating in an offering of penny stock under Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6).

## IX.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## X.

Grant such other and further relief as this Court may determine to be just and necessary.


Dated:  February 28, 2018

                                        */s/ Donald W. Searles*
                                        Donald W. Searles
                                        M. Lance Jasper
                                        Attorneys for Plaintiff
                                        Securities and Exchange Commission

COMPLAINT                              47